UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Sonstegard Foods Company,　　　　　　　　　　　　　Civil No. 05-532 (DWF/AJB)

    Plaintiff,
                         **MEMORANDUM**
v.                      **OPINION AND ORDER**

Wellington Underwriting, Inc.,

    Defendant.

---

James C. Erickson, Esq., and Willard L. Converse, Esq., Jensen, Bell, Converse & Erickson, P.A., counsel for Plaintiff.

Thomas B. Caswell, III, Esq., and Lindsey A. Davis, Esq., Zelle, Hofmann, Voelbel, Mason & Gette LLP, counsel for Defendant.

---

## INTRODUCTION

Plaintiff Sonstegard Foods Company ("Sonstegard") brought the present breach-of-contract action against its business and property insurer, Wellington Underwriting, Inc. ("Wellington"). This matter is before the Court pursuant to Wellington's Motion for Summary Judgment. For the reasons set forth below, the Court denies the motion.

## BACKGROUND

Sonstegard is a South Dakota corporation that does business in Minnesota as a commercial chicken hatchery. Sonstegard produces dried egg product by processing bulk, shelled, liquid eggs in a dryer and bag house at its Howard Lake plant. In the dryer,

the liquid eggs are sprayed into hot air and converted to dried egg product. In the bag house, which adjoins the dryer, excess dried egg product is collected in large bags.

Wellington insured Sonstegard on an all-risk fire and extended property policy ("the Policy") from March 1, 2002 to March 1, 2003. On January 21, 2003, an explosion occurred in Sonstegard's dryer and bag house. The explosion was caused by leaking natural or propane gas.

Sonstegard has produced both edible (fit for human consumption) and non-edible egg product (not fit for human consumption). The United States Department of Agriculture ("USDA") regulates the production of edible egg product. Dr. William Miller, an inspector from USDA Food and Safety Inspection Service ("FSIS") has been on the premises every time Sonstegard has produced edible egg product.

In addition to the USDA's own internal requirements, the USDA also enforces what are called E3A requirements. E3A requirements are drafted and administered by an independent non-profit group of experts. E3A certifies the egg-processing equipment itself, whereas USDA focuses on the overall production process. Usually, once new equipment acquires E3A certification, it is not re-inspected on a regular basis. At the time of construction in 1965, Sonstegard's egg dryer and bag house met the then-applicable E3A requirements.

Miller testified that E3A is not a factor on his checklist that he considers when giving permission for a plant to produce edible egg product. But Miller further testified that he would "look for" the E3A seal on "new," "completely refurnished," "rebuilt," or "reconditioned" equipment or if there was a major event, such as equipment testing

positive for bacteria like salmonella. (Aff. of Thomas B. Caswell, Ex. 1, Dep. of William C. Miller ("Miller Dep.") at 56–57. Since its construction, Sonstegard's egg dryer and bag house have never been E3A re-certified, including after the explosion.

Following the January 2003 explosion, on February 6, 2003, Miller wrote to Sonstegard that:

> It is the determination of this office [USDA] that the damages sustained are not repairable to bring the bag house back to a level acceptable for USDA compliance for future production. In order to continue with USDA product inspections the entire collection system must be replaced.

(Aff. of James C. Erickson, Sr. ("Erickson Aff."), Ex. 3, Dep. of Dr. William Miller ("Miller Dep."), Dep. Ex. 10.) In addition, two companies that Sonstegard asked to review the damage caused by the explosion both recommended that Sonstegard replace, rather than repair, its shaker-type bag house. One company suggested that Sonstegard replace its shaker-type bag house with a reverse air bag house and the other recommended that Sonstegard replace its bag house with a mechanical bag house. In a May 20, 2003 letter, the president of one company stated:

> As I mentioned above the reverse pulse baghouse has universally replaced shaker-type baghouses on food spray drying applications and we believe that a shaker-type baghouse built in 2003 would not comply with [E]3-A sanitary standards and thus it would not be accepted by the USDA for operation with food products.

(Caswell Aff., Ex. 6.)

Then on April 7, 2003, Miller wrote Sonstegard in relevant part that:

permission is hereby granted to clean and recondition your dryer . . . Temporary permission to operate said dryer is contingent on acceptability of the cleaning and conditioning of the dryer. The egg drying operation must meet all USDA FSIS regulations.

3

(Erickson Aff., Miller Dep., at Dep. Ex. 7.) On April 29, 2004, Wellington denied coverage for the replacement cost of they dryer and bag house, but agreed to pay clean-up costs and egg powder loss of $38,033.00 minus a $10,000 deductible. Sonstegard subsequently cleaned the dryer and bag house. But even after the dryer and bag house were cleaned, rust and micro-cracking remained due to the age of the dryer and bag house.

On February 17, 2005, Sonstegard brought this lawsuit, claiming that Wellington breached the Policy by denying coverage for costs to repair the dryer and bag house to gain permanent USDA approval to produce edible egg product. Sonstegard also demanded a valuation appraisal.[1] Sonstegard claims that, as a result of the explosion, USDA still requires that the dryer and bag house be upgraded or improved to meet USDA standards for permanent edible egg production.

Shortly after this lawsuit was filed, the dryer and bag house were used temporarily for edible egg production from March to July 2005. Miller testified that his earlier statement in the February 6, 2003 letter that the dryer and bag house were irreparable was incorrect. (Miller Dep. at 141.) Miller testified that during these production times, the dryer and bag house met USDA FSIS's own regulations, but Miller could not say whether

---

[1] This demand contradicts Sonstegard's request in its Complaint for a specific amount of damages. There, Sonstegard contends that $312,170 is the contractual sum due under the Policy, but subtracts the $28,033 payment for damages and the $10,000 deductible for a remaining total of $274,137. (*See* Compl. at ¶ 14).

4

the dryer and bag house met E3A requirements during those production times.[2] (Miller Dep. at 62.) Miller testified that he was concerned that metal fatigue, micro-cracking, and seam leaks might prevent the dryer and bag house from passing E3A certification. (Miller Dep. at 85.) But he further stated that he would not be able to determine whether the reason for any lack of E3A certification would be due to the age of the dryer and bag house or the explosion. (Miller Dep. at 134.) Ultimately, Miller clearly stated that he has no opinion about whether the dryer and bag house would meet E3A certification today because he is not an E3A expert. (*Id.*)

Wellington now moves for summary judgment on two independent grounds. First, Wellington asserts that the Policy contains an "Ordinance or Law" Exclusion, which precludes coverage as a result of the alleged lack of E3A certification. Wellington claims that after cleaning, the bag house was restored to full compliance with USDA FSIS's own requirements. Wellington argues that Miller corrected his initial statement that the bag house was not repairable in later testimony and that the sole reason the bag house cannot be used for permanent edible egg processing is the alleged lack of E3A certification. Specifically, Wellington argues that Sonstegard cannot satisfy the current E3A

---

2    But the record also includes a letter dated May 16, 2005, in which Miller wrote Sonstegard stating:

> At the present time the dryer is only suitable for non[-]edible egg product. The major problem is seam leakage into the bag house. It appears the damage was from the fire/explosion of January 21, 2003. The bag house does not meet USDA FSIS standards at this time.

(Erickson Aff., Miller Dep., at Dep. Ex. 11.)

requirements because of the existence of rust, micro-cracking, and fatigue, factors that were all present before the explosion.

Further, Wellington asserts that even if another covered cause of loss, in addition to the alleged lack of E3A certification, caused the damage, replacement of the egg dryer and bag house would remain excluded because the Policy contains an "anti-concurrent causation" clause.  Alternatively, Wellington contends that the Policy's "Wear and Tear" Exclusion precludes coverage.  In particular, Wellington claims that surface rust, metal fatigue, and micro-cracking of the metal were all present on the bag house prior to the explosion, thereby precluding coverage as a matter of law.  In response, Sonstegard contends that the Court should sua sponte order partial summary judgment in its favor as to coverage and require the parties to submit to a mandatory appraisal as to damages.

## DISCUSSION

**I.     Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The moving party

bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Contract Construction

A plaintiff in a breach of contract case must prove that: (1) a contract was formed; (2) the plaintiff performed any conditions precedent; and (3) the defendant breached the contract. *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006). Here, it is undisputed that the parties formed a contact by executing the Policy. Wellington asserts, however, that Sonstegard's suit should be dismissed because Wellington did not breach the terms of the Policy.

A court applies general principles of contract interpretation in construing insurance contracts. *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998). The correct interpretation of a clause in an insurance policy is a question of law. *Haarstad v. Graff*, 517 N.W.2d 582, 584 (Minn. 1994). Words in insurance contracts are given their plain and ordinary meaning. *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn. 2001). A court must consider the policy and its exclusions as a whole, and "the terms will not be so strictly construed as to lead to a harsh or absurd result." *Employers Mut. Liab. Ins. Co. v. Eagles Lodge*, 165 N.W.2d 554, 556 (Minn. 1969). Any

ambiguity in the language of an insurance policy must be resolved against the insurer and in accordance with the reasonable expectations of the insured. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 35 (Minn. 1979). And an insurer has the burden of proving that a policy exclusion applies. *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310 (Minn. 1989).

### A. The Policy

Under an all-risk policy, coverage will exist unless a cause of loss is mentioned as an excluded cause. *Sentinel Mgmt. Co. v. N.H. Ins. Co*., 563 N.W.2d 296, 299 (Minn. Ct. App. 1997). Recovery will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless there is a specific provision expressly excluding the loss from coverage. *General Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001). Wellington argues that specific provisions in the all-risk Policy preclude recovery of costs to replace Sonstegard's dryer and bag house. Specifically, Wellington asserts that an Ordinance or Law Exclusion and, alternatively, a Wear and Tear Exclusion bar coverage. The Court will address each argument in turn.

#### i. Ordinance or Law Exclusion

Wellington first asserts that an Ordinance or Law Exclusion precludes coverage for replacement of the dryer and bag house. Wellington relies on the following provisions from the "Special Form," which state in relevant part:

A.   COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

     1.      Excluded in Section B., Exclusions; or
     2.      Limited in Section C., Limitations;

\* \* \*

    B.     EXCLUSIONS

    1.     We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

        a.     Ordinance or Law

            The enforcement of any ordinance or law:

            (1)    Regulating the construction, use or repair of any property; or
            (2)    Requiring the tearing down of any property, including the cost of removing its debris.

        This exclusion, Ordinance or Law, applies whether the loss results from:

            (1)    An ordinance or law that is enforced even if the property has not been damaged; or
            (2)    The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

Wellington asserts that this exclusion precludes coverage because the current E3A requirements as enforced by the USDA—not the explosion—necessitate the need for replacement of the bag house.

In response, Sonstegard contends that the "Special Form"—which contains the Ordinance or Law Exclusion—is not part of the Policy. Specifically, Sonstegard asserts that the word "special" does not appear on the declarations page of the Policy as required

under section A of the "Special Form."[3] (*See* Ericksen Aff., Ex. 1 at 27 ("When *Special* is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS . . .") (italics added).) Therefore, Sonstegard contends that the "Special Form" and its Law or Ordinance Exclusion are inapplicable. Furthermore, Sonstegard asserts that the only other arguably applicable exclusion in the Policy that could bar coverage is the Civil Authority Provision and, according to Sonstegard, that provision does not apply to bar coverage in this case.

The Civil Authority Provision states in relevant part: "The Policy does not insure against loss or increased cost occasioned by any Civil Authority's enforcement of any ordinance or law regulating the reconstruction, repair, or demolition of any property insured thereunder." Sonstegard contends that the Civil Authority Provision does not apply to bar coverage because it only excludes "reconstruction, repair, or demolition of any property" and not the "use" of property, unlike the Law or Ordinance Exclusion that Wellington cites. Moreover, Sonstegard asserts that Wellington buried the Civil Authority Provision on page 72 of the Policy between rather innocuous conditions of coverage in violation of the doctrine that exclusions should be communicated clearly.

The Court finds, as a matter of law, that the Law or Ordinance Exclusion is not part of the Policy. Although Wellington correctly notes that the Policy's declaration page references the document number of the "Special Form," which is physically present in the

---

[3] In contrast, Sonstegard submits a declarations page from another policy with a different insurer that contains the word "special."

Policy, the word "special" does not appear on the declarations page as required by the "Special Form." Because the Court construes any ambiguity against the insurer, the Court therefore holds that the Law or Ordinance Exclusion is not part of the Policy. Alternatively, the Court finds that the Civil Authority Provision, while part of the Policy, does not apply to bar coverage in this case. There is no evidence in the record that the USDA regulates the reconstruction, repair, or demolition of property. Rather, the record reflects that the USDA instead regulates the "use" of property—in this case, whether property can be used to produce edible egg product. Therefore, the Court finds, as a matter of law, that the Civil Authority Provision does not bar coverage here.

Alternatively, even if the Law or Ordinance Exclusion is part of the Policy, genuine issues of material fact preclude summary judgment in favor of Wellington. "So long as extraneous forces cause physical damage to property, this type of exclusion does not defeat recovery when, as a result, a governmental body enforces an ordinance against the property." *Sentinel*, 563 N.W.2d at 302. Here, it is undisputed that the explosion caused damage to the dryer and bag house. But material fact issues exist regarding why the USDA will not allow Sonstegard to produce permanent edible egg product.[4]

---

4  Therefore, genuine issues of material fact preclude a determination of whether the anti-concurrent causation clause would apply to bar coverage. That clause provides:

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> a.     Ordinance or Law

(Footnote Continued on Next Page)

Although Wellington asserts that lack of E3A certification is the reason, the record does not necessarily support that assertion. No expert from E3A has inspected the dryer and bag house since the explosion and subsequent cleaning. Further, Miller testified that he is not an E3A expert and does not know whether E3A experts would re-certify the dryer and bag house or not, and, if not, whether lack of certification would be due to damage caused by the explosion or pre-existing rust and wear. Miller has not stated in any of his letters to Sonstegard nor in his deposition that the USDA will not permit Sonstegard to produce permanent edible egg product because of lack of E3A certification. Accordingly, Wellington is not entitled to summary judgment.

### ii.     Wear and Tear Exclusion

Alternatively, Wellington asserts that the Policy's Wear and Tear Exclusion precludes coverage for the cost of replacing the dryer and bag house. That exclusion provides in relevant part:

> 2.     We will not pay for loss or damage caused by or resulting from any of the following:
>
> * * *
>
> d. (1)  Wear and tear;
>    (2)   Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself.

---

(Footnote Continued From Previous Page)
(Caswell Aff., Ex. 3 at 27.)  In response, Sonstegard asserts that the irrepairable damage caused by the explosion was the only efficient cause that led to the permanent shut-down of the bag house.

(Caswell Aff., Ex. 3 at 28.)[5]  Wellington contends that it is undisputed that the existence of rust, corrosion, and deterioration give rise to the necessity to replace the dryer and bag house.  Therefore, Wellington asserts that the Wear and Tear Exclusion precludes coverage.

"Wear and tear" refers to the process of ordinary or natural deterioration of an object.  *Sentinel*, 563 N.W.2d at 301.  In order to be excluded as wear and tear, "damage must result from a fixed attribute of the damaged property." *Id.* (citing omitted).  Therefore, the Wear and Tear Exclusion applies to damage caused by aging or deterioration of the dryer and bag house "but does not apply when damage is caused by application of some external force such as fire, wind or snowstorm." *Hampton Foods v. Aetna Cas. and Surety Co.*, 787 F.2d 349, 352 (8th Cir. 1986).

Here, it is undisputed that a gas leak caused an explosion in Sonstegard's egg-processing plant that damaged the dryer and bag house.  It is also undisputed that the USDA will not permit Sonstegard to produce permanent edible egg product in its plant.  But it is unclear whether wear and tear or rust and corrosion caused the damage that prevents permanent production.  No expert from E3A has ever inspected the dryer and bag house since the explosion.  In addition, Miller has never stated that the USDA will not approve the dryer and bag house for permanent edible egg production because of lack of E3A certification.

---

[5]  Sonstegard does not dispute that the Policy contains a Wear and Tear Exclusion.  But Sonstegard cites to the Wear and Tear Exclusion found in the "All Risks of Physical

(Footnote Continued on Next Page)

Further, even if the dryer and bag house would not meet E3A certification, it is unclear whether any failure to do so results from damage caused by the explosion, by wear and tear, or rust.  It is also unclear whether Wellington's payment to clean the dryer and bag house removed the damage caused by the explosion or whether damage from the explosion still exists and is preventing the USDA from allowing Sonstegard to produce permanent edible egg product.  Viewing the evidence in the light most favorable to Sonstegard, the Court finds that Wellington has not met its burden of proving that the Wear and Tear Exclusion applies to bar coverage.  Accordingly, Wellington is not entitled to summary judgment on this claim.

**B.     Sonstegard's Request for Sua Sponte Partial Summary Judgment**

Based on the Court's rulings on Wellington's Motion for Summary Judgment, the Court declines to treat Sonstegard's opposition brief as a motion for partial summary judgment.  The Court finds that the issue of damages has not been sufficiently briefed.  At oral argument, Sonstegard admitted that it did not know what its measure of damages would be, although Sonstegard admits that the Policy does not cover replacement costs.  (*See* Sonstegard's Mem. Opposing Wellington's Summ. J. Mot. and in Supp. of Sua Sponte Partial Summ. J. for Sonstegard at 12.; Tr. at 28.)  Further, assuming Sonstegard is correct that the term "Agreed Value," which is found in the optional-coverage section, applies in this case, Sonstegard admits that it does not know what that

---

(Footnote Continued From Previous Page)
Loss or Damage" section, which provides that the Policy does not insure against "[l]oss or damage caused by . . . wear, tear . . . corrosion, rust[.]"  (Ericksen Aff., Ex. 1 at 66.)

14

term means.[6]  It is Sonstegard's responsibility to articulate a more complete argument before the Court.

## CONCLUSION

The Court seeks to assist the parties in negotiating a resolution to their dispute.  If the parties wish to schedule a settlement conference, they should contact Kathy Thobe, Calendar Clerk for Magistrate Judge Arthur J. Boylan, at (651) 848-1210.  If the Court can be of any further assistance in this matter, the parties should contact Lowell Lindquist, Calendar Clerk for Judge Donovan W. Frank, at (651) 848-1296.

Accordingly, **IT IS HEREBY ORDERED THAT**:

1. Wellington's Motion for Summary Judgment (Doc. No. 41) is **DENIED.**

2. Sonstegard's Request for Sua Sponte Partial Summary Judgment (Doc. No. 49) is **DENIED**.


Dated:  May 21, 2007　　　　　　　　　s/Donovan W. Frank
　　　　　　　　　　　　　　　　　　DONOVAN W. FRANK
　　　　　　　　　　　　　　　　　　Judge of United States District Court

---

[6]　　Wellington asserts that it has satisfied its obligations under the Policy.  At oral argument, Wellington stated that the Policy provides that it only has to pay the least of the following amounts:  (1) the "actual cash value of that property"; (2) the "cost of reasonably restoring that property to its condition immediately before 'loss'"; or (3) the "cost of replacing that property with substantially identical property."  (Tr. at 12 (citing Ericksen Aff., Ex. 1 at 58.).)  Wellington claims that it has restored the property to its condition immediately before the explosion by paying $38,033.00 (minus a $10,000 deductible) to clean the dryer and bag house and for loss of egg powder.  Assuming that this provision applies, on the record before the Court, however, genuine issues of material fact exist regarding whether the dryer and bag house were restored to their pre-loss condition.

15